Dennis FISHER, Plaintiff-Appellee,

v.

PROCTER & GAMBLE MANUFACTURING COMPANY, Defendant-Appellant.

Nos. 77–2204, 77–2205 and 77–2474.

United States Court of Appeals, Fifth Circuit.

March 12, 1980.

---

**21.** Of course, we express no view as to whether taxpayer ought to prevail in a future mitigation action.

528

Gregory L. Hellrung, Harold S. Freeman, Cincinnati, Ohio, Royal H. Brin, Jr., Dallas, Tex., for defendant-appellant.

Linda N. Coffee, Dallas, Tex., for plaintiff-appellee.

Douglas S. McDowell, Washington, D.C., Robert E. Williams, Kenneth C. McGuiness, Washington, D.C., for Equal Employment Advisory Council, amicus curiae.

Before THORNBERRY, GEE and HATCHETT, Circuit Judges.

HATCHETT, Circuit Judge:

In this Title VII class action,[1] brought on behalf of black employees at the Dallas plant of the Procter & Gamble Manufacturing Company (Company), we review a district court order finding discrimination in promotion practices, hiring, and job assignments. The order was entered prior to recent Supreme Court pronouncements directly bearing on the issues raised. While certain conclusions of the district court are inconsistent with present case law, we find other legally sufficient grounds to support its judgment in all but one respect. Accordingly, we affirm in part and vacate and remand in part.

The Company is a corporation organized and existing under the laws of the State of Ohio, doing business in Dallas, Texas. At its Dallas plant, the Company engages in the manufacture and distribution of food, soap, and synthetic detergents. The Dallas plant has operated since 1921 and has a current work force of more than 500 employees. Dennis Fisher, began employment at the Dallas facility as a hydrolizer attendant in 1967 and has been employed by the Company since that time. On March 10, 1971, Fisher filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) alleging racial discrimination against black and Spanish-American employees at the Dallas plant.[2] An EEOC right to sue letter was issued on May 24, 1974 and Fisher instituted this Title VII action on July 15, 1974.

Fisher brought the action "on his own behalf and on behalf of other persons similarly situated pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure." The district court certified the case as a class action on behalf of all blacks employed by the Company since March 10, 1971, and all

1. 42 U.S.C. § 2000e et seq.

2. Fisher charged:
   The company discriminates against me and other Negroes in that:
   1) Negroes get worse job assignments.
   2) Negroes get less pay.
   3) Negroes are subjected to racial slurs.

4) The company uses tests to deprive Negroes of job opportunities.
5) The company does not have Negro supervisors, the company does not hire Spanish surnamed Americans, the company does not hire Negro females.

future black applicants at the Dallas plant. In his complaint, Fisher charged the Company with the following conduct:

1. The establishment of a promotion system which intentionally preserves the Company practice and policy of "limiting employment and promotional opportunities of black employees."

2. The classification of all management positions as "white only," and the attempt to exclude black employees from these positions.

3. The classification of security guard positions as "white only."

4. Discrimination "against black employees in the area of job assignments."

5. Discrimination "against black employees in terms of compensation."

6. The failure to prohibit racial slurs against black employees by white employees.

7. The utilization of non-professionally developed ability tests "to deprive blacks of job opportunities."

8. The failure to take affirmative action to remove the present effect of past discrimination against black persons.

Fisher further charged that he was denied promotion to a lab position in March, 1971, solely because of his failure to score well on an ability test which bore no relationship to the skills required of the job.

After a non-jury trial on the class liability issues, the district court found Company discrimination in hiring, promotions, and job assignments.

## HISTORICAL FRAMEWORK

In July, 1972, the Company instituted an affirmative action program designed to make "equal opportunity . . . meaningful" at the Dallas facility. In the written plan, the purposes for the affirmative action program were outlined by the president of the Procter & Gamble Company:

It will remain the policy of Procter & Gamble to seek out and employ members of racial or ethnic minorities. We will make special effort to employ not only the qualified but the qualifiable. We will educate our incumbent managers on the aims and the proper execution of this program. We will maintain working conditions where minority employees will find peace, dignity, challenge and equal opportunity for advancement.

Local plant managers assumed responsibility for the effective implementation of the plan. The plan included numerical hiring and promotion "goals" for each job classification, and stressed the need for stronger efforts in specified employment categories where minorities were significantly underrepresented.[3] The designated categories of significant underrepresentation included management, professional, technical, skilled, clerical, and semi-skilled positions.

Other affirmative actions outlined in the plan included:

1. active involvement in local minority organizations;

2. periodic audit of training, hiring, and promotion programs to remove impediments to the attainment of goals;

3. regular discussions with local managers, supervisors, and employees to insure compliance with company policies; and,

4. review of the qualifications of all employees "to insure minorities and women are given full opportunities for transfers and promotions."

Supervisors were responsible to prevent harassment of minorities and were advised that their equal employment efforts would be measured in evaluating their work performance. Racial Awareness Seminars were instituted to correct work force attitudes hindering EEOC efforts. The program has been updated each year since 1972 to reaffirm policies and revise goals.

The impact of Company efforts is reflected in the increase in minority employment at the plant from 1966 to 1977. As depicted in the chart below, the percentage

---

**3.** According to the plan, "goals are not considered rigid and inflexible quotas which must be met, but are targets reasonably attainable by means of applying good faith efforts to make all aspects of the Affirmative Action Program work."

of black employees at the Dallas plant increased from .5% of the Company's total work force in 1966 to 14.7% of the total work force in 1977.

### Minority Employment Figures

| Dates | Black Employees | Total Work Force |
|---|---|---|
| 1966 | 3 | 549 |
| 1967 | 8 | 545 |
| 1968 | 19 | 565 |
| 1969 | 29 | 545 |
| 1970 | 41 | 545 |
| 1971 | 38 | 490 |
| 1972 | 46 | 505 |
| 1973 | 61 | 531 |
| 1974 | 61 | 516 |
| 1975, January | 64 | 508 |
| 1975, July | 69 | 515 |
| 1977, January | 74 | 505 |

The plaintiff does not rely on these overall employment figures to substantiate his claim of unlawful discrimination under Title VII. According to Fisher, only when we examine the promotional progress of black employees, can we discern whether the Company has engaged in discriminatory acts prohibited by law.

### BLACKS IN LOWER ECHELONS OF EMPLOYEE HIERARCHY

Although the overall percentage of black employees at the Dallas plant has increased substantially during the ten year period preceding the institution of this action, blacks have remained concentrated in lower level non-management positions.

### Management.

As of January 1, 1977, blacks constituted fourteen and seven tenths percent (14.7%) of the Company's total work force. In the same year, thirty-five and five tenths percent (35.5%) of the non-management employees having seniority dates after July 1, 1966 were black. As noted by the district court, the Company employed its first black manager in 1970. On March 1, 1971, one of the Company's seventy-seven management employees was black. At the time this action was filed, one of sixty-three management positions was held by a black. At the same time, blacks comprised eleven and eight tenths percent (11.8%) of the Company's total work force. From September 11, 1970, to the time the suit was instituted there were seventeen new managers, one of whom was black. The district court found that although the position of supervisor or line manager was of critical importance in matters of promotion, discipline, and employee relations, no black person had ever been a supervisor as of the time the action was brought. No black has ever held any operations manager position.

### Non-Management.

As the district court recognized, the mechanic and lab analyst positions are critical non-management jobs and highly attractive to employees.[4]

At the time judgment was entered in this case, one of seventy-six mechanic jobs at the plant was held by a black. Between December, 1967, and January, 1977, three of forty-four mechanic openings were filled by blacks. At the time of judgment, blacks held none of the twenty-two lab analyst jobs. Of the twenty-four lab analyst job openings between December, 1967, and January, 1977, one was filled by a black. Blacks were underrepresented in other important job categories including manufacturing clerical,[5] and security guard positions.[6] In contrast, the district court found

---

4. The district court found that six pay levels exist for non-management positions in the plant. From the lowest to the highest, the levels are: A (Specialist I); B (Specialist II); C (Specialist III); D (Technician I); E (Technician II); and F (Technician III). With few exceptions, employees in mechanic and lab analyst positions are paid at the D, E or F rate levels.

5. The district court noted that as of March 29, 1971, blacks held none of the forty-one clerical jobs and that since that time the Company's annual Employer Information Reports (EEO–1 Forms) have never indicated more than one black holding a clerical position. As of January, 1976, one of twenty-nine clerical positions was filled by a black.

6. The district court found that the Company had never employed a black security guard: "Of twelve security guard jobs bid from September, 1970, until January 1, 1977, only one black was selected, but he subsequently withdrew his bid."

overrepresentation of blacks in the "slide handler" position, which is considered "one of the least desirable jobs" at the plant.[7]

Blacks are significantly underrepresented in key upper level positions in a Company whose total work force fairly represents the racial make-up of the standard metropolitan area in which it is located.[8] This incongruity draws into question the design and operation of the system employed to select applicants and promotees for these higher level positions.

It is the Company's policy and practice to hire persons into various entry level positions and to provide them with on-the-job training and experience.[9] Higher level openings are most often filled by current low or entry level employees demonstrating capability for promotion or transfer. Accordingly, class members claiming underrepresentation in higher level positions, have focused their attack not on the Company's initial hiring practices but on the promotion system utilized at the plant.[10]

## THE COMPANY'S PROMOTION SYSTEM

Under the terms of the collective bargaining agreement between the Company and the Independent Oil and Chemical Workers of Dallas it was agreed that:
Plant Seniority shall be the governing factor in both promotions and demotions in all cases where ability and merit, as judged solely by the Employer, are approximately equal. Seniority of an em-

ployee shall begin after he has been continuously in the employ of the Employer for six months and shall then be computed from the latest date of employment.

* * * * *

It is understood that in all cases under Article XI, Seniority, where the Employer exercises his judgment of ability and merit, such judgment is not subject to arbitration.

* * * * *

Notice of a job vacancy or a new job will be made by posting for three days on the plant bulletin boards, showing the type of job and rate. If no one in the plant bids on the job, or is qualified, the job shall be open to new hires.

Promotion to all non-management categories other than security guard positions is governed by the terms of the collective bargaining agreement. Plant-wide seniority governs in all cases where ability and merit are judged to be approximately equal by the Company. Different merit and ability assessment schemes are utilized depending on the importance of the job from the Company's perspective. With respect to most jobs in the plant, merit and ability are judged by evaluating the bidder's work performance, absentee record, disciplinary history and pertinent medical condition. Promotion to the "most critical" non-management jobs is made pursuant to a selection procedure designated by the Company as "a

7. Employees working as slide handlers stack pieces of finished product into a pattern, formation or tie so that the product may be mounted on a forklift for relocation and distribution. Work as a slide handler at the Dallas plant was conducted in a warehouse which had no drinking fountain and which lacked adequate ventilation.

8. The trial court found that approximately twelve and eight tenths percent (12.8%) of the total work force in the Dallas-Fort Worth Standard Metropolitan Statistical Area is black. Blacks comprised fourteen and seven tenths percent (14.7%) of the plant's total work force as of January, 1977.

9. The following job titles or classifications require entry level skills: Employee Services

Staff Technician I, Industrial Engineering Staff Technician I, Office Staff Technician II, Accounting Staff Technician I, Office Staff Technician I, Office Staff Specialist III, Maintenance Technician I, II & III, and Management. Entry level positions require no previous skills.

10. In his pre-trial brief, Fisher acknowledged that "[t]he primary issues raised in this litigation concern Defendant's alleged job classifications based on race and racially discriminatory promotional policy. Correllary [sic] issues concern job assignments, Defendant's efforts to remove the vestiges of past discrimination and Defendant's efforts to insure a working atmosphere free of racism."

professionally developed total assessment process." [11]

All employees are entitled to "bid" laterally, downward, and upward across all departments for job vacancies occurring anywhere in the plant. When a job vacancy occurs, a notice is posted throughout the plant for three days. The notice includes the number of vacancies, the department in which they occurred, the job title, wage rate, and a brief description of the nature of the work. The notice also informs employees that anyone interested in bidding must either attend a meeting at a specified time and place, or contact a designated person to make alternative arrangements. After the bid is removed, the bidders are listed according to plant seniority. If the vacancy occurs with respect to one of the less critical jobs in the plant, the senior bidder will be awarded the job if he is determined to have average merit and ability under the above noted general criteria for positions not requiring total assessment. If the vacancy occurs in one of the more critical plant positions, total assessment will be utilized to measure the merit and ability of the job bidders.

*The Total Assessment Process.*

"Total assessment" is a system designed to gather extensive evidence regarding an applicant's job related capabilities. The system is characterized by four main features. First, the identification of skills, abilities and other aspects of work behavior which are considered important for the effective performance of the job being considered. The Company refers to these indicia of effective performance as "what counts" factors.[12] These factors are determined for each position based on the results of national surveys of company supervisors distributed by the Procter & Gamble Com-

pany in Cincinnati, Ohio. The surveys ask company supervisors to rate what they feel to be the key criteria for effective performance of the production jobs within their unit. A second feature of the total assessment system is the use of several means to secure evidence of a given applicant's capabilities.[13] Once the Company knows what factors count, it must have valid means of determining whether a given applicant meets the necessary criteria. Next, the system requires a uniform method of recording and organizing the evidence received. Finally, the process demands a systematic means of evaluating the evidence to provide a sound basis for advancement decisions.

The non-management level jobs for which total assessment is utilized include mechanic, lab analyst, and high level operator positions. Job bidders for these positions with the greatest plant-wide seniority and with at least an "acceptable" total assessment profile are selected to fill the vacancies. Because the most senior acceptable bidder will be selected to fill the vacancy, only the more senior bidders are initially totally assessed. If an acceptable bidder is not found in this group of senior bidders, a second group of the next senior bidders is totally assessed.

Each of the employees in the separated group of senior bidders begins the total assessment process by completing what is referred to as an Experiences Form. The form asks the bidder to state specific personal experiences either on or off the job, which relate directly to the "what counts" factors listed for the position sought. Additionally, managers acquainted with the bidder's work performance complete Employee Description Forms, describing incidents of the bidder's job performance as they relate

---

11. These include mechanic, lab analyst, and high level operator positions.

12. These factors vary with the job being considered. For instance, "dexterity and coordination" is one of the eight designated "what counts" factors for mechanical positions, but is not listed as a "what counts" factor for high level operator positions.

13. Among the means used to secure evidence are: the application form and other pertinent records; an "experiences form" completed by the applicant; an "experiences form" completed by one or more managers in a position to describe specific experiences typical of the employee's performance; a structured interview procedure; and the use of aptitude and ability examinations.

to the "what counts" factors. On the form, these same managers also make recommendations as to the applicant's suitability for the job he is seeking. If two or more managers indicate that they "do not recommend" the applicant, the assessment will not be continued. Next, two managers, one having responsibility for the job to be filled, and one involved in employment matters, interview the applicant. The interviewers independently prepare a profile of the applicant, rating him on a scale from one to seven on the various "what counts" factors. At the interview, the bidder is given an opportunity to relate additional information which may demonstrate his ability to effectively perform the work required. Finally, written aptitude or production tests are administered to each of the bidders.[14] For mechanic positions the bidder takes the Aptitude Form M–A Test.[15] Bidders for lab analyst positions take the Aptitude Form C–M Test.[16] Bidders for high level operator positions take the Aptitude Form M–A Test and the Production Control Test (PCT).[17] The test results are used as one of the factors in the Company's evaluation of the applicant's ability and potential to perform the job for which he applies.

Utilizing all of the above data, the bidder is rated in each of the what counts areas and is given an overall total assessment performance rating of "strong", "acceptable", "borderline" or "weak". The senior bidder who has achieved at least an acceptable rating will be selected for the job. As the district court noted, generally a senior applicant rated acceptable will be selected over a junior applicant rated strong, but a junior applicant rated acceptable will be selected over a senior applicant rated borderline. If none of the senior group of bidders who have undergone total assessment receives an "acceptable" rating, the process is repeated for the next highest group of seniority bidders.

*Management Positions.*

The Company fills the majority of its management level vacancies by hiring recent college graduates with engineering or other technical degrees. The remaining management level vacancies are filled by promotion from non-management positions within the plant. Non-management employees being considered for promotion to management must go through total assessment, including the taking of the Aptitude Form P–M Test.[18]

### DISTRICT COURT ORDER

After a non-jury trial, the district court concluded that the Company discriminated

---

14. The Company refers to these examinations as "professionally developed tests" which are designed to measure the ability and merit of the bidder in relation to the particular job sought.

15. The Aptitude Form M–A Test was designed in the personnel research department of the Procter & Gamble Company, Cincinnati, Ohio, in 1964. The Company considers the test appropriate for use in reviewing applicants for "jobs requiring considerable mechanical ability." The test is designed to measure mechanical comprehension, reading comprehension, and the ability to handle technical information.

16. The Aptitude Form C–M Test was designed in the personnel research department of the Procter & Gamble Company, Cincinnati, Ohio. It was first instituted at the plant in 1963. It is a factor in considering an applicant for a position as a clerk or laboratory analyst in a manufacturing plant or a cost clerk or laboratory technician in a technical center. The examination tests vocabulary, mathematic, and data interpretation skills.

17. The Production Control Test (PCT) was designed at the personnel research department of the Procter & Gamble Company, Cincinnati, Ohio. It was first used at the plant in 1972. The Company views the test as appropriate for use in considering candidates for production jobs in manufacturing "which require the ability to make judgments about the quality level of products based upon readings from gauges and other displays." The test is composed of forty items and calls for decisions about product quality based upon readings from a set of five gauges.

18. The Aptitude Form P–M Test was designed in the personnel research department of the Procter & Gamble Company, Cincinnati, Ohio. It was specifically designed for use with candidates for first-line management positions. The test was instituted at the plant in 1967. It is a ninety minute examination consisting of forty-eight multiple choice questions, designed to measure reading comprehension and data interpretation.

against plaintiff's class in its practices relating to job assignments and in its promotional policies relating to management, mechanical, lab analyst, manufacturing clerical, and security guard positions. The court found no business necessity for the college degree requirement for hiring into management or for the 20 years experience requirement for promotion to management. Moreover, the total assessment program was determined to be an invalid promotion tool "as long as blacks are so disproportionately underrepresented in defendant's management." Finally, the Aptitude Form C–M Test, when used for clerical positions, and the Aptitude Form P–M Test, when not used in conjunction with a valid total assessment program, had not been shown to be professionally developed ability tests within the meaning of 42 U.S.C. § 2000e–2(h).

The district court entered its judgment against the Company, and ordered it to:

1.  compensate the plaintiff class for discriminatory promotion practices in an amount to be determined by the court at a later hearing;

2.  include in all posted vacancy notices a statement informing employees that attendance at the meeting of bidders to discuss the vacancy is mandatory;

3.  devise a test, if a test is used, for manufacturing clerical positions which fully meets EEOC Guidelines concerning criterion—related validation;

4.  discontinue use of the Aptitude Form P–M Test for selection of non-management employees for management posi-

tions, unless it is used in conjunction with a valid assessment program;

5.  prepare and file either proposed affirmative action plans or a single affirmative action plan,[19] containing the elements delineated in the court's Conclusions of Law;[20] and

6.  pay attorney's fees to the plaintiff's attorneys and to the attorneys for certain "objectors".

## ISSUES

The Company argues that the district court erred in: (I) considering events which occurred prior to September 11, 1970, the beginning of the effective statute of limitations period; (II) basing its liability finding on the Company's hiring practices, which were never at issue in this case; (III) finding Company discrimination in promotion to management and key non-management positions; (IV) finding Company discrimination in its job assignment practices; (V) awarding attorney's fees to counsel for certain class members who, according to the Company, had never become parties to the lawsuit; and, (VI) ordering the Company to remedy practices which had not been found to be discriminatory.

## DISCUSSION OF THE ISSUES

### I.

The Company argues that the district court erred in failing to restrict the evidence to alleged acts of discrimination occurring after September 11, 1970, the beginning of the EEOC statutory period.[21]

---

**19.** The class plaintiffs were also ordered to submit a proposed affirmative action plan. As an alternative, the parties were permitted to submit "an agreed upon plan instead of separate, proposed plans."

**20.** In its Conclusions of Law, the district court directed that any such plan shall include provisions relating to: "training programs; opportunities for college training or training at a technical institute; goals for promotion of blacks into positions in which defendant has been found to have discriminated; clear explanations to the non-management employees of the selection procedures for promotions, including explanations of the roles played by the PM,

MA, CM, and PCT tests; disciplinary procedures; plans for reduction of racial tensions at defendant's plant; and plans for making defendant's management personnel more aware of and sensitive to the situation of black employees."

**21.** An EEOC complaint must be filed within 180 days of the alleged discriminatory act. 42 U.S.C. § 2000e–5(e); *Hamilton v. General Motors Corp.*, 606 F.2d 576 (5th Cir. 1979); *Chappell v. Emco Machine Works Co.*, 601 F.2d 1295 (5th Cir. 1979); *McArthur v. Southern Airways, Inc.*, 569 F.2d 276 (5th Cir. 1978) (en banc). The 180th day prior to the March 10,

Resolution of this issue is guided by Supreme Court pronouncements issued after the district court judgment was entered. *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977); *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977). According to the Company, these cases foreclose judicial consideration of prior discriminatory acts which are said to have continuing impact on alleged discriminatees. The cases, however, establish no such prohibition.

In *Teamsters*, the Supreme Court discussed the effect of section 703(h) of Title VII, 42 U.S.C. § 2000e-2(h),[22] on a seniority system which "operate[d] to freeze the status quo of prior discriminatory employment practices." 431 U.S. at 349, 97 S.Ct. at 1862. Under the seniority system in *Teamsters*, lower paid city drivers who transferred to more desirable line driver jobs were required to forfeit all competitive seniority accumulated in their former positions, and to start with the lowest seniority in the line driver pool. By discouraging transfer to more desirable positions, the system perpetuated the effects of past discriminatory hiring. The government argued that such a system could not be "bona fide" within the meaning of section 703(h). According to the court, however, section 703(h) was designed to immunize seniority systems that allowed for the full exercise of seniority accumulated before the effective date of the Act. The court held that "an otherwise neutral, legitimate seniority system does not become unlawful under Title VII simply because it may perpetuate pre-Act discrimination." 431 U.S. at 353–354, 97 S.Ct. at 1864.

The *Teamsters* rationale was developed further in *Evans*, where the Court addressed the legality of a seniority system which perpetuated post-Act discrimination.[23] In *Evans*, a female flight attendant was forced to resign upon her marriage in 1968, but was rehired by the airline in 1972. The attendant did not file an EEOC charge of discrimination within 90 days of her separation in 1968.[24] Recognizing that this failure barred relief based directly on the 1968 resignation, the flight attendant argued that she was the victim of a continuing violation caused by the impact of the past illegal act on her present seniority status. This continuing violation was said to have occurred within the statutory period preceding her EEOC charge of discrimination which was filed in 1973. The Court acknowledged that the airline's refusal to credit the flight attendant with pre-1972 seniority gave present effect to the past discriminatory act of forced resignation. It was not convinced, however, that the continuing effect of the past act of discrimination was sufficient to constitute a "present violation" of the Act:

> Respondent emphasizes the fact that she has alleged a *continuing* violation. United's seniority system does indeed have a continuing impact on her pay and fringe benefits. But the emphasis should not be on mere continuity; the critical question is whether any present *violation* exists.

431 U.S. at 558, 97 S.Ct. at 1889.

The attendant in *Evans* based her entire claim on the present *application* of a neutral seniority system which perpetuated the effects of a past discriminatory act not

---

1971 date on which Fisher filed the EEOC charge of discrimination is September 11, 1970.

**22.** Section 703(h), 42 U.S.C. § 2000e-2(h), provides:

Notwithstanding any other provision of this [Title], it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority or merit system . . . provided that such differences are not the result of an intention to discriminate be-

cause of race, color, religion, sex, or national origin. . . . .

**23.** As the *Evans* court acknowledged, the seniority system gave "present effect to a past act of discrimination" occurring subsequent to the effective date of the Act. *Evans*, 431 U.S. at 558, 97 S.Ct. at 1889.

**24.** The applicable time limit on the date she filed her claim was 90 days. Effective March 24, 1972, this time limit was extended to 180 days. See section 706(d) of Title VII, 42 U.S.C. § 2000e-5(e).

made the subject of a timely charge. The Court held that the operation of an otherwise bona fide and neutral seniority system is not unlawful under Title VII merely because it perpetuates post-Act discrimination that has not been made the subject of a timely charge of discrimination.

Neither *Evans* nor *Teamsters* foreclose consideration of prior discrimination in all circumstances. They hold only that prior discrimination, by itself, cannot make the operation of an otherwise bona fide seniority system unlawful. They do not hold, as the Company suggests, that a continuing violation can never constitute an actionable wrong; only that the *mere* perpetuation of the effects of pre-Act or time barred discrimination does not constitute a present violation. *See also, Pettway v. American Cast Iron Pipe Co.,* 576 F.2d 1157 (5th Cir. 1978); *James v. Stockham Valves & Fitting Co.,* 559 F.2d 310 (5th Cir. 1977); *Clark v. Olinkraft, Inc.,* 556 F.2d 1219 (5th Cir. 1977). In *Olinkraft* this court noted that notwithstanding *Evans,* where an entire promotion system is challenged on the basis that it operates to hold plaintiffs "in lower echelons," the 180 day statutory period is inconsequential in determining the admissibility of prior discriminatory acts.

■ After reciting Company employment and promotion practices occurring prior to September 11, 1970, the district court noted that such evidence "is relevant and admissible to show possible plant-wide discriminatory conduct with continuing effects, the probability of the continuation of such conduct, and the relationship between past actions and present effects and actions." *Citing, Swint v. Pullman-Standard,* 539 F.2d 77 (5th Cir. 1976); *Burns v. Thiokol Chemical Corp.,* 483 F.2d 300 (5th Cir. 1973). There is no question that, without the benefit of *Teamsters* or *Evans,* the dis-

trict court overstated the test for the consideration of past discriminatory conduct. The challenged evidence was improperly considered, however, only if the district court viewed the prior discriminatory acts as constituting the actionable wrongs upon which relief was based. *Dobbs v. City of Atlanta, Ga.,* 606 F.2d 557 (5th Cir. 1979); *United Air Lines v. Evans.* If, on the other hand, prior practices were considered relevant to show independently actionable conduct occurring within the statutory period, the district court did not err in taking the evidence into account.[25]

■ Considering the district court order in its entirety in light of all the evidence before it, we conclude that the court did not improperly premise its judgment on past discrimination. The EEOC charge and class action complaint alleged the present existence of racially discriminatory employment practices. The major thrust of the complaint was directed at the promotion system still in effect at the plant. The court found discrimination not with respect to pre-1971 conduct, but in specific employment practices occurring within the appropriate statutory time frame.[26]

■ One other factor should be emphasized in considering the admissibility of testimony regarding past acts of discrimination. Unlike the private suit in *Evans,* this action brought under challenge a broad range of employment practices which were said to affect nearly all past, present, and future black employees at the Dallas plant. Thorough and coherent consideration of the plaintiff's claims would necessarily require the recognition of various factors which carry no independent legal consequences. In reviewing class action cases of this kind, where the challenges are broad and sweep-

---

**25.** As the Supreme Court stated in *Evans:*

A discriminatory act which is not made the basis for a timely charge is the legal equivalent of a discriminatory act which occurred before the statute was passed. *It may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue, but separately considered,* it is merely an unfortunate event in history which has no

present legal consequences. *Evans,* 431 U.S. at 558, 97 S.Ct. at 1889. (Emphasis supplied).

**26.** As noted, the court found that the Company had committed discriminatory acts in promotion to management and certain non-management positions, and in assignment to various jobs.

ing, we are more inclined to accept the district court's assessment of the admissibility of evidence which it deems relevant. Fed.R.Evid. 403, 404; *Claiborne v. Illinois Central Railroad*, 583 F.2d 143 (5th Cir. 1978); *James v. Stockham Valves*. We conclude that the district court did not err in admitting evidence of past discriminatory acts.

## II.

■ The Company next contends that the trial court erred in basing its liability finding on hiring practices which were never at issue in this case. The Company is correct in asserting that its hiring practices were not directly in issue before the district court. The plaintiff's complaint did not allege discrimination in hiring. Hiring practices were not set forth among the contested issues of fact or law in the court's pre-trial order. Fisher's pre-trial brief acknowledged that the issue of overall hiring practices was "simply not being raised in this litigation." The question then becomes to what extent has the district court based its judgment on discriminatory hiring practices of the Company. We find that with the exception of one finding and conclusion, the court correctly limited its holding on discrimination to employment practices other than hiring. *Consideration* of hiring practices, both before and after the applicable statutory period, is a necessary predicate to meaningful findings regarding employment practices at issue in this case. *See, Clark v. Olinkraft, Inc.* To fully examine the significance and impact of promotion policies on black advancement within the Company, the court properly identified the number and percentage of black employees hired at entry-level positions over a substantial period of years. The figures were not used to independently form the basis for a finding of liability against the Company. That finding, with one exception, was premised on the Company's discriminatory promotion practices and job assignments.

■ Although we find nothing improper in the court's consideration of hiring figures to substantiate its finding of discriminatory promotion practices, we believe the court erred in making specific conclusions of discriminatory hiring into management positions. According to the court, the Company demonstrated no business necessity for its policy of hiring only recent college graduates with engineering or technical degrees. Whatever the legal sufficiency of that conclusion, the issue had not been properly joined or litigated before the district court. Accordingly, we vacate those portions of the district court judgment requiring the Company to alter its hiring qualifications and other hiring practices. *Hodges v. United States*, 597 F.2d 1014 (5th Cir. 1979); *Pierre v. United States*, 525 F.2d 933 (5th Cir. 1976).

## III.

■■ Citing what it calls the "application of erroneous and inappropriate legal principles," the Company argues that the district court erred in concluding that the Company discriminated against blacks in promotion to management, mechanical, lab analyst, manufacturing clerical, and security guard positions.[27]

27. The Company also asserts that the district court erred in concluding that the Company "demonstrated no business necessity" for its *policy of hiring into management* "only recent college graduates with engineering or technical degrees," and for its "twenty years experience" requirement for promotion from non-management to management positions. Our determination on the impermissibility of district court conclusions on hiring renders unnecessary a discussion of the college graduation requirement for hiring into management. Because the twenty years experience requirement relates to promotion from non-management to management positions within the Company, our consideration on this point is not foreclosed by our holding that hiring practices were not before the district court. Shortly before trial, a black employee with only nine years experience was successfully promoted to a management level position. Fisher asserts that the promotion establishes that there is, as the district court concluded, no business necessity for the twenty years requirement. The Company points to that same promotion to argue that there was never any twenty years experience requirement for promotion to management. Whatever the Company policy at this time, we affirm the

The district court premised its conclusion on several major findings. While we agree that one of these findings has no basis in present case law, we are satisfied that the conclusion is amply supported on other legally sufficient grounds.

Applying legal principles then in effect, the court found that the Company "does not have a bona fide seniority system within the meaning of 42 U.S.C. § 2000e–2(h)."[28] Under the law of this circuit at the time the judgment was entered, seniority systems which perpetuated the effects on incumbent employees of prior discrimination were not bona fide within the meaning of 703(h) of Title VII, 42 U.S.C. § 2000e–2(h). *United States v. Jacksonville Terminal Company,* 451 F.2d 418 (5th Cir. 1971); *Local 189, United Papermakers and Paperworkers v. United States,* 416 F.2d 980 (5th Cir. 1969).

■■■ Since *Teamsters* and *Evans,* however, we have recognized that an otherwise bona fide seniority system "is not itself illegal merely because it perpetuates the effects of pre-Act or post-Act discrimination." *Pettway v. American Cast Iron Pipe Co.,* 576 F.2d 1157, 1189 (5th Cir. 1978). In other words, a seniority system is no longer non-bona fide because it operates to "'freeze' the status quo of prior discriminatory employment practices." *Teamsters,* 431 U.S. at 349, 97 S.Ct. at 1862. Instead, "purposeful discrimination in connection with the establishment or continuation of a seniority system is integral to a determination that the system is or is not bona fide." *James v. Stockham Valves,* at 351. In *Stockham Valves* we noted four factors to be considered in determining whether a seniority system is bona fide:

1) whether the seniority system operates to discourage all employees equally from transferring between seniority units;

2) whether the seniority units are in the same or separate bargaining units (if the latter, whether that structure is rational and in conformance with industry practice);

3) whether the seniority system has its genesis in racial discrimination; and

4) whether the system was negotiated and has been maintained free from any illegal purpose.

*Id.* at 352.

[11] There are no individual "seniority units" at the Dallas plant. Seniority for all purposes is calculated on a plant-wide basis without regard to prior job classification. The system does not lock employees into inferior jobs by requiring them to commit "seniority suicide" by forfeiting accumulated seniority upon advancement. See, *Stockham Valves,* at 348; *Teamsters,* 431 U.S. at 344, 97 S.Ct. at 1859. Any employee may compete for any job vacancy in the plant based upon his total length of service with the Company. Moreover, as in *Teamsters,* there is no evidence in the record to show that the seniority system had "its genesis in racial discrimination" or that it was negotiated and maintained for any "illegal purpose." *Teamsters,* at 356, 97 S.Ct. at 1865.[29]

Acknowledging that the court's order was premised on case law then in effect, we reject its finding that the seniority system was not bona fide within the meaning of 703(h) of Title VII. The system is therefore legally valid under the immunity of that provision.

■■■ The existence of a bona fide seniority system, however, does not shield the Company from "*other* illegal acts, so long as those other acts are independently actionable." *Pettway,* at 1189. It is well

---

district court finding on lack of business necessity. The Company is enjoined from imposing a twenty year requirement in the future, whether or not it has in the past.

**28.** We note at the outset that management and security guard positions are not covered by the terms of the seniority system embodied in the union contract. Because we uphold the district court conclusion as to discrimination in promo-

tion to these positions on other grounds, we need not separately consider the effects of the seniority ruling on positions not covered in the union contract.

**29.** Fisher conceded in his pre-trial brief that the "seniority provision is a neutral employment practice."

recognized that racially discriminatory promotion practices are actionable wrongs under Title VII regardless of the bona fide character of the controlling seniority system. *See, Davis v. Board of School Commissioners of Mobile County,* 600 F.2d 470 (5th Cir. 1979); *Claiborne v. Illinois Central Railroad; James v. Stockham Valves; Pettway; Teamsters.* Moreover, post-Act discriminatees may receive complete retroactive seniority "without attacking the *legality* of the seniority system as applied to them." *Teamsters,* 431 U.S. at 347, 97 S.Ct. at 1861. (Emphasis supplied)

Like the plaintiff in *Clark v. Olinkraft,* Fisher contends not only that the seniority system perpetuates the effects of past discrimination, "but also that discrimination in promotion . . . constitutes a continuing and unlawful employment practice in violation of Title VII." *Clark v. Olinkraft,* at 1222; *see also, Stockham Valves,* at 351.

■■■ The district court found that the Company had committed present and continuing violations. This conclusion was premised not only on the court's finding that the seniority system was not bona fide, but on its finding that the Company engaged in active discrimination in granting promotions to certain positions. Because the record supports the latter finding, the district court's erroneous determination as to the bona fide nature of the seniority system does not affect the outcome.[30]

■■■ When plaintiffs assert that they have been victims of the "disparate impact" of illegal promotion practices, proof of discriminatory motive is not required under Title VII. *Davis v. Board of School Commissioners of Mobile County,* at 473; *Teamsters,* 431 U.S. at 335 n. 15, 97 S.Ct. at 1854 n. 15; *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). Once the plaintiffs have demonstrated the racially adverse impact of promotion practices and tests, it becomes the Company's burden to prove job relatedness or business necessity. *Scott v. City of Anniston, Alabama,* 597 F.2d 897 (5th Cir. 1979); *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976).

■■■ We find ample record evidence to demonstrate the disparate impact of Company promotion policies. As noted, while blacks comprise 14.7% of the total work force, they are marked by their conspicuous presence in the "lower echelons" of the employee hierarchy. *See Clark v. Olinkraft, Inc.,* at 1222; *Rich v. Martin Marietta Corp.,* 522 F.2d 333, 348 (10th Cir. 1975). When this action was filed, one of the sixty-three company managers was black, none of the twenty-two lab analysts was black and none of the security guards was black. At the time of judgment, one of twenty-nine clerical workers was black, and one of seventy-six mechanics at the plant was black. The Company asserts that these figures are insufficient to support a prima facie case, without competent evidence to show the percentage of black workers in the community possessing the necessary skills and qualifications for the underrepresented positions. *Hazelwood School District v. Unit-*

---

**30.** There is a further reason for not finding reversible error in the district court's determination that the seniority system was not bona fide. For the purposes of determining the validity of a seniority system which perpetuated the effects of past discrimination, the Court in *Teamsters* refused to distinguish between systems that perpetuate pre- and post-Act discrimination. *Teamsters,* 431 U.S. at 348 n. 30, 97 S.Ct. at 1861 n. 30. As to relief, however, the Court concluded that while post-Act discriminatees may receive full "make-whole" relief, including retroactive seniority to the date of their employment, pre-Act discriminatees may receive retroactive seniority only to the effective date of the Act. Accordingly, the issue whether the seniority system is bona fide under section 703(h) of Title VII is relevant to this case "only if . . . the class of black employees represented by the plaintiffs consists of some blacks who suffered only from pre-Act discrimination." *James v. Stockham Valves,* at 351. The class in this case is limited to blacks employed since March 10, 1971, and future employees at the Company plant. The earliest seniority date for a current black employee at the plant is August 8, 1966. There is no claim that any class members suffered only from pre-Act discrimination. We therefore note that even if the seniority system were properly held to be non-bona fide, "such a holding would in no way enlarge the relief to be awarded." *Teamsters,* 431 U.S. at 348 n. 30, 97 S.Ct. at 1861 n. 30.

*ed States,* 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977); *Williams v. Tallahassee Motors, Inc.,* 607 F.2d 689 (5th Cir. 1979). In *Hazelwood,* the Supreme Court approved the use of comparative statistics showing a narrow labor pool defined by those qualified for employment to particular jobs available. The court explained:

> When special qualifications are required to fill particular jobs, comparisons to the general population (rather than to the smaller group of individuals who possess the necessary qualifications) may have little probative value.

*Id.* at 308 n. 13, 97 S.Ct. at 2742 n. 13.

■■■■ Mindful of *Hazelwood,* we nevertheless find the plaintiff's statistics adequate to establish a prima facie case. First, a prima facie case may be shown without evidence of qualifications where the inference of discrimination is supported by a compelling level of racial underrepresentation in a sizeable work force. *Jones v. Tri-County Electric Cooperative, Inc.,* 512 F.2d 1 (5th Cir. 1975); *see e. g., United States v. Hayes International Corp.,* 456 F.2d 112 (5th Cir. 1972); *Parham v. Southwestern Bell Telephone Co.,* 433 F.2d 421 (8th Cir. 1970). In *Hayes International Corp.,* we noted that when substantial underrepresentation is shown as compared with general population figures, the burden of proving lack of qualifications is on the Company. Moreover, the usefulness of statistics of this nature "varies with the surrounding facts and circumstances, which either support or undermine the inference of discrimination offered by the statistics." *Williams v. Tallahassee Motors, Inc.,* at 691; *United States v. Ironworkers Local 86,* 443 F.2d 544 (9th Cir. 1971). The Company's entry level hiring policy is a distinctive circumstance in this case supporting the inference of discrimination. When a company adopts a policy and practice of hiring in at low level unskilled jobs and promoting to upper-level positions based upon training received and skills developed at the plant itself, it cannot convincingly challenge the prima facie showing under the *Hazelwood*

"qualifications" dicta. Where skills are commensurate with company training, we will approve statistical comparisons between racial make-up in key positions and racial composition in the total work force. See, *James v. Stockham Valves,* at 341; *Scott v. City of Anniston,* at 901. Because the statistics support the district court finding of adverse impact upon black employees, the burden shifted to the Company to explain the racial disparity by proving job relatedness. *Williams v. Tallahassee Motors, Inc.; Rodriquez v. East Texas Motor Freight,* 505 F.2d 40 (5th Cir. 1974), *vacated and remanded on other grounds,* 431 U.S. 395, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977). Advanced promotion at the plant was premised on two company practices found objectionable by the district court—the administration of qualifying tests for certain positions and the application of the total assessment program.

### Qualifying Tests.

Section 703(h) of Title VII, 42 U.S.C. § 2000e–2(h) provides that it shall not be an unlawful employment practice:

> for an employer to give and to act upon the results of any professionally developed ability test provided that such test, its administration or action upon the results is not designed, intended or used to discriminate because of race, color, religion, sex or national origin.

■■■■ When an examination has been shown to affect a racially disparate impact, the employer must prove that the test is job related. *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); *Griggs v. Duke Power Co.* The employer does not meet his burden by establishing merely a rational basis for the test. It must be validated by a demonstration that the examination is "appropriate for the selection of qualified applicants for the job in question." *Washington v. Davis,* 426 U.S. at 247, 96 S.Ct. at 2051; *Dothard v. Rawlinson,* 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977).

The district court found that the Form C–M Test,[31] when used in promotion to manufacturing clerical positions, and the Form P–M Test,[32] as employed in the promotion to management positions, had not been proved to be professionally developed ability tests within the meaning of 42 U.S.C. § 2000e–2(h). Both tests were designed in the personnel research department of the Procter & Gamble Company, Cincinnati, Ohio.

The Company has not met its burden to show validation of these tests for the purposes cited. A validation study for the Form C–M Test relating to selection to manufacturing clerical jobs was conducted in 1975. The district court noted, however, that the study "found no statistical or practical significance in the correlation of test scores and job performance for blacks."[33] No criterion-related validation study was shown to support the use of the Form P–M Test. The court found that the test "lacked content validity for the majority of job factors deemed most significant" for the performance of supervisorial duties.[34] In the absence of any company showing that the tests had been properly validated, the district court did not err in concluding that the exams had not been shown to be professionally developed ability tests under section 703(h) of Title VII.

*Total Assessment.*

Once a prima facie case of discriminatory *practices* has been shown, "it becomes the employer's burden to demonstrate the job performance validity of its practices." *Scott v. City of Anniston,* at 901; *Williams v. Tallahassee Motors, Inc.; Washington v. Davis.* This, the Company has not done. As the district court noted, ratings on "what counts" factors such as "desire to do the work well," "working well with others," and "learning the work" involve substantial subjectivity. Moreover, management performance appraisals, experience forms, and scheduled interviews also provide a mechanism for subjective analysis. As the court explained, these promotional tools provide raters the "opportunity to choose which events to emphasize or omit." Under total assessment, all bidders for promotion must be reviewed and assessed by management personnel at the supervisory level.

Against this backdrop, the district court found that when this action was instituted in 1974, no black person had ever been a supervisor at the Company plant. Nor had any black manager participated as a rater in total assessment for promotion. At the completion of the trial, no black had acted as a rater in total assessment for promotion in which a final selection had been made. In light of these and other factors,[35] the

**31.** The examination is a two-part test consisting of 100 questions to be answered within 49 minutes. The questions are designed to test the applicant's vocabulary, mathematic and chart analysis skills. *See infra,* footnote 16.

**32.** The Form P–M examination consists of 48 multiple choice items designed to measure skills in two areas: reading comprehension and data interpretation. *See infra,* footnote 18.

**33.** The court ordered the Company to devise a C–M Test which meets the EEOC guidelines concerning criterion-related validation.

**34.** The job factors deemed significant for supervisory personnel as determined by the Company from the results of questionnaires submitted to 114 managers in Procter & Gamble Co. plants throughout the nation are: concern for others; satisfaction in the role of a first-line manager; ideas and change; initiative in problem-solving and decision-making; technical knowledge of departmental operations; written

communications skills; organization of work of others and follow-up; strength and firmness; effectiveness under stress; feel for relative importance of various aspects of work; and willingness to work hard.

**35.** The court also considered overt acts of discrimination showing active bias against potential black managers. Among the specific acts found by the trial court were these: a black was allegedly rejected for a management position because he was over-qualified; a white supervisor told a non-management employee that he, the supervisor, was a racist; another white manager told a black employee that blacks were not capable of performing the higher level jobs; the plant's industrial relations manager stated that blacks need more training than whites because whites are more accustomed to working in industry; and the plant manager stated to black employees that whites would have to approve whomever was selected as the first black supervisor.

court concluded that total assessment was not a valid method for evaluating qualifications for promotion. We agree. This court has recognized that promotion systems utilizing subjective evaluations by all white supervisors provide a ready mechanism for discrimination. *Hamilton v. General Motors Corp.*, 606 F.2d 576 (5th Cir. 1979); *accord, James v. Stockham Valves; Rowe v. General Motors Corp.*, 457 F.2d 348 (5th Cir. 1972). The significant underrepresentation of blacks in supervisory level management positions, provides an adequate basis for the district court's invalidation of the Company's total assessment program.

■■■ Having discredited the two major mechanisms upon which advanced promotions were premised, the district court found discrimination in promotion to key company positions. We sustain the district court finding of discrimination in promotion to mechanic, lab analyst, manufacturing clerical, security guard,[36] and management positions.

## IV.

■■■ Having carefully reviewed the evidence offered to show discrimination in assignment to the "slide handler" position, we find no error in the district court's conclusion.[37]

## V.

■■■ On April 1, 1976, the district court held a hearing to consider entry of a proposed consent decree. In response to notice of the proposed decree, fifty-two members of the certified class appeared through separate counsel at the hearing. These class members objected to the entry of the proposed consent decree. After hearing arguments from Fisher, the Company, and the "objectors," the court disapproved the proposed consent decree and set this action for trial. Prior to trial, the court ordered that an attorney other than Fisher's could "represent the objectors in this class action and need not formerly intervene." The Company now challenges the award of reasonable attorney's fees to the "objectors" attorney. According to the Company, the objectors are not "prevailing parties" to this suit within the meaning of section 706(k) of Title VII, 42 U.S.C. § 2000e–5(k). Section 706(k) provides: "In any action or proceeding under this [Title] the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee . . . ." We have often declared that "an award of attorneys' fees and its calculation in a Title VII action are matters left for the sound discretion of trial judges." *Claiborne v. Illinois Central Railroad*, at 155; *Baxter v. Savannah Sugar Refining Corp.*, 495 F.2d 437 (5th Cir. 1974); *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974). The Supreme Court in *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978), perceived two equitable considerations supporting the award of attorney's fees to prevailing Title VII plaintiffs:

> First, as emphasized so forcefully in *Piggie Park*, [*Newman v. Piggie Park Enterprises*, 390 U.S. 400, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968)] the plaintiff is the chosen instrument of Congress to vindicate "a policy that Congress considered of the highest priority." 390 U.S. at 402, 88 S.Ct. 964. Second, when a district court

36. While neither total assessment nor legally invalid tests applied in promotion to security guard positions, the disproportionate underrepresentation of blacks in this position, unexplained by the Company, was sufficient to support the district court finding of discrimination. *Scott v. City of Anniston; Claiborne v. Illinois Central Railroad.*

37. There is no dispute that the slide handler position is one of the least desirable in the plant. *See infra*, footnote 7. The district court found that as of March, 1971, five of six slide handler positions were held by blacks. A white employee who had been working as a slide handler was reassigned to an easier and more desirable repacking job, although he was junior in seniority to all of the blacks who shared his position. After the slide was moved to the warehouse, two relatively easy jobs were created and the two most senior employees working at the slide received those positions. When one of these two employees was injured, a white replaced him, despite the fact that a black in the same position on the slide had more seniority.

awards counsel fees to a prevailing plaintiff, it is awarding them against a violator of federal law.

*Id.* at 418, 98 S.Ct. at 699.

In light of the public rights involved, "the award should be in such an amount to insure that attorneys will undertake representation in this type of case." *Baxter v. Savannah Sugar Refining Corp.,* at 447.

 We are satisfied that under the broad discretion vested in the court by virtue of section 706(k), the district court was justified in granting attorney's fees to the "objectors." The objectors were plaintiff class members who performed a valuable service for the class of which they were a part. In opposing the consent decree in a case in which the plaintiffs ultimately prevailed at trial, the objectors benefited their class and helped to vindicate the important public rights protected by Title VII. The court permitted the objectors to participate in the trial of this cause through their own counsel, without having to formally intervene. The better practice would have been for the trial court to have formally recognized and certified the objectors as a subclass, and we conclude that this is what in fact, though informally, occurred here. Since this is so, we do not disturb this award. We note, however, that in following this course under the circumstances of this case we in no sense countenance any general or unsupervised proliferation of class representation. Here the matter was called to the court's attention and passed on by it, albeit informally. In the normal case, a certified class is assumed to be sufficiently harmonious and unified in interest that one set of attorneys can and should represent it adequately; and just insofar as those attorneys fail to do so to such an extent that additional counsel must appear, the first set must be viewed as having performed inadequately.

## VI.

Finally, the Company argues that the district court erroneously attempted to remedy practices not found to be discriminatory. As noted, the court ordered the Company to prepare a proposed plan in conformity with the court's conclusions. The proposed plan has been withheld pending the outcome of this appeal. In this opinion we have dealt with the Company's challenges to those conclusions, and note simply that the court's directions regarding the plan shall be modified to meet the scope of this decision.

### AFFIRMANCE AND REMAND

The district court's judgment with respect to the bona fide nature of the Company's seniority system, and the practices relating to hiring into management, is vacated. In all other respects the judgment is affirmed. The case is remanded for proceedings consistent with this opinion.

AFFIRMED in part; VACATED and REMANDED in part.