**Wayne Alfred JOHNSON,**
**Plaintiff-Appellant,**

v.

**GENERAL TIRE AND RUBBER CO.,**
**Defendant-Appellee.**

**No. 80–2336**
**Summary Calendar.**

United States Court of Appeals,
Fifth Circuit.
Unit A

Aug. 6, 1981.

E. Brice Cunningham, Dallas, Tex., for plaintiff-appellant.

Carrington, Coleman, Sloman & Blumenthal, Peter Tierney, Dallas, Tex., for defendant-appellee.

Appeal from the United States District Court for the Western District of Texas.

Before BROWN, POLITZ and TATE, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

## I.

Appellant, Wayne A. Johnson, instituted this Title VII suit in January 1980, alleging that because of his race, appellee, General Tire, had failed to (i) promote him to the position of foreman when he returned to work from sick leave in 1978, (ii) consider him for a management position, or (iii) allow him to return to work following an extended sick leave and instead terminated him. The Court concluded that Johnson had failed to prove a prima facie case regarding any of the three claims and that he had been terminated because there was no job in the bargaining unit he was qualified to perform or be transferred to. Based on a careful review of the record, we do not find any of the District Court's findings of fact clearly erroneous, or its conclusions of law to be wrong, and, therefore, we affirm the Court's judgment in all respects.

## II.

Johnson, a Negro male, was hired by General Tire as a tractor tire builder in May of 1970. During his employment with General Tire, he worked as a tire builder, utility man and spidone slitter.

While working as a tire builder, Johnson developed back trouble causing him to miss approximately nine months of work in 1973 and 1974. When he returned to work after his back trouble, he was given a medical transfer to the job of utility man in order to accommodate his medical problem. Such medical transfers were governed by the collective bargaining agreement in effect during Johnson's employment at General Tire. Later on, he was given another medical placement to the job of spidone slitter to accommodate both his back problem and a reoccurring dermatitis condition.

Subsequently, his back trouble was somewhat remedied, but Johnson continued to experience frequent flare-ups of his dermatitis condition aggravated by the tire plant environment. This condition had developed in the Armed Services prior to commencing employment with General Tire. However, Johnson on his pre-employment interview had failed to disclose the condition.[1] Because of absences related to the dermatitis condition, Johnson worked less than one full year in the five year period between January 1, 1974, and his termination, October 18, 1978.

Johnson attempted to return to work in July of 1978 but was able only to work for a day and a half before his dermatitis forced him to stop working. General Tire was informed by Johnson's doctor that the heat and chemicals in the plant environment were irritating the skin condition, and that his recommendation to Johnson was to discontinue working at General Tire.

When Johnson attempted to return to work in October of 1978, he was told that the company had determined that there was no job in the bargaining unit he could perform because of his dermatitis. He did inquire about management positions but was told there were none available due to his medical disqualifications. He was, therefore, terminated.

Johnson filed a grievance with the Union concerning his discharge and charges with the Equal Employment Opportunity Commission in February 1979. No action was taken by the Union on the grievance and the Equal Employment Opportunity Commission found there was no reasonable cause to believe Johnson had been discriminated against. This appeal followed and Johnson now argues that because of his race, General Tire failed to promote him to a supervisory or management position at any time during his employment, refused to shift him to some other bargaining unit position when he returned from extended sick leave in October 1978, and, subsequently, terminated him.

### III.

The plaintiff in a Title VII case bears the burden of proving by the preponderance of the evidence a prima facie case of discrimination. *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Therefore, Johnson was required to prove that he applied for promotion or transfer to a job for which he was qualified and for which he was rejected; as to termination, it was necessary to prove that he was terminated from a job for which he was qualified. In addition, plaintiff must show that these decisions were made by General Tire "under circumstances which give rise to an inference of unlawful discrimination." *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1094, 67 L.Ed.2d at 216.

The existence of a prima facie case is most often gauged by the formula announced by the Supreme Court in *McDonnell Douglas Corporation v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). That formula requires the plaintiff to show (i) that he belongs to a racial minority, (ii) that he applied and was qualified for a job for which the employer was seek-

---

1. The Court noted in its findings of fact and conclusions of law that Johnson answered in the negative two questions "have you ever been treated for a skin eruption?" and "do you have or have you had a service connected ill-

ness?" Both of these questions were asked in Johnson's pre-employment interview with General Tire's medical department prior to employment.

ing applicants, (iii) that, despite his qualification, he was rejected, and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of plaintiff's qualifications. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824, 36 L.Ed.2d at 677. The proof offered must negate the possibility that the rejection was based on the applicant's lack of qualifications or the lack of an available position—two of the most common legitimate reasons for rejection. To rebut the plaintiff's prima facie case if one is made, a defendant must then articulate some legitimate, nondiscriminatory reason for the employment action. The sufficiency of the admissible evidence in satisfying this burden of production is whether the evidence raises a genuine issue of fact such that the trier of fact could conclude that the employment decision had not been motivated by discriminatory animus. *Burdine*, 450 U.S. at 254, 101 S.Ct. at 1094, 67 L.Ed.2d at 218.

We now review the evidence before us in order to determine whether it meets these standards.

### A. Failure To Promote

Johnson alleges that he "constantly applied for" positions as supervisor, foreman or other management position. He contends further that there were management positions open during the time he sought promotion for which he was qualified, specifically that of personnel manager, but instead of promoting him to that position, General Tire promoted a person with fewer qualifications.

Although Johnson refers to available management positions in the plural, the personnel management job was the only one for which he specifically claims to have been qualified. At trial, Johnson also referred to a "foreman's job", but the only evidence of the existence of such a job was Johnson's statement that he "had heard they were promoting foreman." He made no claim to having been qualified for a foreman's job, and no evidence was adduced to show that he was qualified or that such a job was, in fact, open or ever filled. In addition, the foreman works in the same plant environment as the workers in which he supervises, therefore, Johnson conceded at trial that he would have come in contact with chemicals and other plant irritants in this position.

Johnson further testified that there was a management position in the insurance field for which he applied in 1976, but he knew nothing of the person hired for it except that he was a white male. When questioned about his own qualifications for that job, he admitted that his only experience in insurance matters was having received worker's compensation benefits and company accident and health policy benefits.

For the personnel manager job, Johnson testified that when the existing personnel director left in 1976, he applied for that position. Johnson further claims that the job was filled by a white male. According to Johnson, when the latter person left within the next year, he was replaced by a white female. There was no explicit testimony that Johnson requested the job at this point, but he argues in his brief that instead of promoting him, General Tire filled the position with a white female who, Johnson asserts, was less qualified than he. This statement is not supported by the record and there is no evidence whatever of the white female's qualifications.

More importantly, it is impossible for Johnson to rely on the personnel position to support his cause of action for racial discrimination because it was filled long before commencement of the relevant limitations period for his claims. As a prerequisite to filing a Title VII action, a plaintiff must have filed a timely charge concerning the alleged unlawful employment practice with the Equal Employment Opportunity Commission. 42 U.S.C.A. § 2000e–5(e), (f)(1). *See, e. g., Bracamontes v. Amstar Corporation*, 576 F.2d 61, 62 (5th Cir. 1978). An Equal Employment Opportunity Commission charge is timely only if filed within 180 days after the alleged unlawful employment practices occurred. *See Fisher v. Proctor & Gamble Manufacturing Company*, 613 F.2d 527, 538–39 (5th Cir. 1980), *cert. denied*, 449 U.S. 1115, 101 S.Ct. 929, 66 L.Ed.2d 845 (1981). Johnson alleges in

his complaint that his February 1979 charge of discrimination had been filed within 180 days of the acts complained of in the complaint. By implication, the challenged acts would have occurred between August 1978 and February 1979. Specifically, the complaint alleges that on October 18, 1978, Johnson was denied a foreman promotion, and, added generally, that General Tire had failed to consider him for a management position. Only at trial did it become apparent that Johnson was attempting to base his non-promotion claim on acts which occurred as much as two years before the 180 day cut-off. Since Johnson has failed to make a timely charge, failure to place him in that job could have no present legal consequences in Johnson's present action. *See United Air Lines v. Evans*, 431 U.S. 553, 558, 97 S.Ct. 1885, 1889, 52 L.Ed.2d 571, 578 (1977).

■ Our review of the record has not uncovered any evidence of supervisory or management jobs which were open and for which Johnson applied and was rejected in early August 1978. Therefore, we find the Court correct in holding that Johnson had failed to make a prima facie case on his non-promotion claim under the *McDonnell Douglas* formula because he had failed to show the existence of any supervisory or management job which was open, for which he applied, for which he was qualified and from which he was rejected within the relevant time period.

### B. Failure To Transfer

■ Johnson next argues that his termination was wrongful because there were other bargaining unit jobs he could have performed, but that because of his race, General Tire opted to terminate him rather than transfer him to such a job. Johnson contends that when he attempted to return to work in October 1978, after being unable to work because of dermatitis for almost the entire previous two years, General Tire should have moved him to another bargaining unit job. The collective bargaining agreement contained detailed provisions governing all aspects of transfers between such jobs including transfers of employees unable satisfactorily to perform jobs due to

ill health. The record indicates that Johnson was, in fact, given two medical transfers under those provisions to accommodate his medical condition. The collective bargaining agreement, however, provides for transfers only to a job for which the transferee is qualified. Johnson suggests several jobs for which he would not have been medically disqualified since, he claims, he would not come in contact with the irritants which aggravated his condition—forklift operator or stock clerk. However, at trial the only jobs referred to by Johnson were forklift driver and final finish worker. Johnson was unable to define what a final finish worker did but he did explain the forklift job as picking up tires set on a pallet. When cross-examined about the forklift job, Johnson admitted he would be working around tires and could not say whether or not people perspired heavily in the windowless warehouse where such forklift jobs were performed.

At this point in the trial evidence had already established that Johnson's skin flare-ups were caused by temperature and perspiration. Johnson's doctor had indicated that he needed to be in a cool, dry area where he would not perspire heavily and that it would be advisable to terminate his employment at General Tire because of the inability to control his dermatitis while working. The doctor further stated that when Johnson worked in a hot and sweaty type environment, his condition becomes acutely inflamed.

But even more significant than this cumulative testimony, was the fact that there was no evidence introduced that there was a forklift operator job—or *any* bargaining unit job open in October when Johnson returned to work or that such a job ever opened at any time thereafter. Similarly, Johnson pointed to no job existing at any time around or after October 1978 filled by an employee he might have had sufficient seniority to bump.

Clearly, having shown no job to which he could have been transferred, Johnson has raised no inference that General Tire's decision not to transfer him a third time was in any way racially motivated. Johnson presented no evidence of a specific job he

could have filled, and as to the general job categories referred to in his testimony at trial, his claim that he could have performed in one of them is unsupported by the medical evidence in the record. Based on this medical evidence, General Tire articulated that there was no bargaining unit job in which Johnson's dermatitis would not continue to disable him, and, therefore, the company decided to terminate his employment. The trial court correctly found that the medical disqualification was General Tire's motivation for the termination action—that finding is not clearly erroneous.

### C. Termination

Likewise, the Trial Court found that Johnson was terminated "because of his reoccurring disabling medical problem." Johnson's argument that there was no evidence to show he was not qualified for the job from which he was terminated is meritless in light of the fact that Johnson himself provided uncontradicted testimony in support of that finding.[2] Moreover, it was not General Tire's burden to introduce evidence that Johnson was unqualified; rather, it was Johnson's burden to show he *was* qualified for the job from which he was terminated. *See Whiting v. Jackson State University*, 616 F.2d 116, 121 (5th Cir. 1980).

The record indicates that Johnson returned to General Tire as a tractor tire builder in July of 1978 and worked a day and a half. After that, Johnson explained his dermatitis condition "got to the point that [he] could not perform that job any more." Upon leaving in July, Johnson applied for further accident and health benefits, claiming his dermatitis as a "total disability." There is not a shred of evidence in the record which hints that due to Johnson's dermatitis he *was* capable of, or could ever be capable of, performing the tire builder job from which he was terminated.

### Conclusion

The Trial Court could properly find the evidence insufficient to establish a prima facie case on any of Johnson's claims. The District Court's judgment was correct.

AFFIRMED.

---

2. Appellant testified:

Q: It gets warm in the General Tire plant environment, particularly in the summer, does it not, sir?
A: Yes, it does.
Q: You sweat in those bargaining unit jobs in the plant environment, do you not?
A: Those that I had I did.
Q: And sweat, you were told by the doctor, aggravated your skin condition, isn't that right, sir?
A: Correct.
Q: And you were told by Dr. Lee that working around chemicals and solvents and carbon black and other irritants in the carbon plant environment irritated your dermititis.
A: Yes.

Q: And I take it that when you got away from that environment, your condition improved rather rapidly.
A: Yes, it did.
Q: When you came back into the area of the agents and chemicals, your condition flaired up again?
A: Right.
Q: After you left in July of 1978, after the dermatitis flair-up, when you went back to Dr. Lee, he told you if you could not find an environment free of the sweat and irritants of the General Tire plant, you should find another job, didn't he?
A: He told me that.
Q: He told you that if you did return to that environment, even if he might give you a release, your dermatitis would flair-up again.
A: Right. As long as I'm exposed.